UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | | |
|---|---|---|---|
| VIVIAN S. CAHILL and THE ESTATE OF SANDRA F. GARDNER, by its Personal Representative, Michael H. Gardner, | : | Case No.: | 22-cv-00543-SM-DPC |
| | : | | |
| Plaintiffs | : | Judge: | SUSIE MORGAN |
| vs. | : | | |
| | : | Magistrate: | DONNA PHILLIPS CURRAULT |
| GREGORY G. FAIA, VERNON H. DECOSSAS III, FAIA & ASSOCIATES, LLC, ADS SQUARED LLC, VISUAL AD GROUP, INC., and DSE LEASING, LLC, | : | | |
| | : | | |
| Defendants | : | | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, ALTERNATIVELY, TRANSFER, AND ALTERNATIVE MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(7) AND 12(B)(6)**

Defendants Gregory G. Faia, Vernon H. Decossas III, Faia & Associates, LLC, Ads Squared LLC, Visual Ad Group, Inc., and DSE Leasing, LLC ("Defendants") respectfully submit this Memorandum in Support of their motion seeking (1) dismissal or, alternatively, a transfer, pursuant to the First-to-File Rule; and (2) alternatively, dismissal of the operative complaint or particular claims under Federal Rule of Civil Procedure 12(b)(7) or 12(b)(6).

*First*, pursuant to the First-to-File Rule, the Court should dismiss or alternatively transfer this action to the United States District Court for the Middle District of Florida, because the issues pending before the court in *In re TPI*, No. 19-bk-8638-CPM (M.D. Fla. Bkr.) (Adv. Proc. 21-ap-333) (filed 9.24.2021) (the "Florida Litigation") substantially overlap with the issues raised in this suit (the "Louisiana Action"). *See* Exhibits 10, 11, and 12. The central issue in the Florida Litigation is whether there were certain executed "Options," and whether Vivian S. Cahill ("Cahill") and Sandra F. Gardner ("Sandy") were merely the alter-egos/proxies, or nominees of Sigmund Solares ("Solares") and Michael Gardner ("Gardner"). Similarly, the central disputed issue in the Louisiana

Action is whether Cahill and Sandy are simply "nominees" with respect to the same Options, or whether they are the real parties-in-interest who hold full control of the Options for their own benefit.[1] Additionally, the relevant evidence and witnesses likely to be called in the Florida Litigation and the Louisiana Action, including Solares, Gardner and Defendants Vernon Decossas ("Decossas") and Gregory Faia ("Faia") are the same. Because of this duplication of claims, the risk of inconsistent rulings is high. Further, the first-filed court (the Middle District of Florida) has a superior interest in resolving the issues, because trying these actions in two different forums would be wasteful and inefficient. Finally, none of the exceptions to the first-to-file rule apply: Defendants did not engage in bad faith conduct or anticipatory filing with respect to the Florida Litigation, and there is no valid or exclusive forum selection clause.

*Second*, pursuant to Rule 12(b)(7), Plaintiffs' claims should be dismissed for failure to join "required" parties under Federal Rule of Civil Procedure 19—specifically, Solares (the brother of Cahill) and Gardner (the executor of Sandy's Estate), who are defendants in the Florida Litigation. The joinder of Solares and Gardner as parties is required because they are the real parties in interest. Their joinder will not deprive the court of subject matter jurisdiction, Solares and Gardner have an interest relating to the subject of the action, and disposing of the action in Solares' and Gardner's absence would leave Faia and Decossas subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations. Solares and Gardner are the true parties here, while Cahill and Sandy's Estate are merely their alter-egos and nominees.

*Third*, pursuant to Rule 12(b)(6),[2] Plaintiffs' Louisiana Unfair Trade Practice Act ("LUTPA") and delictual fraud claims should be dismissed as prescribed to the extent that

---

[1] *See* Docket # 55 at ¶ 198.

[2] Defendants reserve their right to raise additional reasons that Plaintiffs' claims should be dismissed for failure to state a claim upon which relief may be granted in a second Rule 12 Motion to

Plaintiffs' claims are based on actions taken by Defendants more than one year prior to Plaintiffs' filing. LUTPA and Louisiana delictual fraud actions have a one-year prescriptive period. *See* LA. R.S. 51:1409; LA. CIV. CODE art. 3492; *Robin v. Binion*, 469 F.Supp.2d 375, 389 (W.D. La.2007), aff'd, 271 Fed. Appx. 436 (5th Cir.2008). Most, if not all, of Plaintiffs' LUTPA and fraud allegations center upon incidents that allegedly occurred and were discovered in 2020, or earlier. As Plaintiffs filed this action more than one year later, the relevant claims should be immediately dismissed.

## I.  BACKGROUND

### A.  The Underlying Option Agreements

The above-captioned suit is the latest chapter in a bitter, sprawling legal dispute that has consumed millions of dollars and the past seven years of Defendants' lives and that has played out largely in the Middle District of Florida. As told by Plaintiffs, the ultimate prizes at issue are the operations and assets of several companies originally founded by Solares and Gardner in the early 2000's. Docket # 55 at p. 1-2. Plaintiffs in this matter, of course, are Solares' sister (Cahill) and Gardner's deceased mother (Sandy), whose estate appears in this matter through her son and executor, Gardner ("Gardner-as-Executor"). Docket # 55 at p. 2.

It is undisputed that, in 2006 and 2009, Gardner and Solares hired Defendants Decossas and Faia to help manage certain companies owned by Solares and Gardner. *Id.* At around the same time, the Solares-Gardner businesses were gaining unwanted attention from the IRS and several

---

Dismiss. *See* Fed. R. Civ. P. 12(h)(2); *Doe v. Columbia-Brazoria Ind. Sch. Dist. By & Through Bd. of Trs.*, 855 F.3d 681, 686 (5th Cir. 2017) (citing *Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 141 (5th Cir. 2007))). Defendants will undoubtedly be required to supplement their motion upon receipt of the Bankruptcy Court's ruling on the "nominee issue" which is expected by the end of October, 2023.

Fortune 500 companies unhappy with Solares and Gardner's practice of "cyber-squatting."[3] Ultimately, these pressures prompted Solares and Gardner to contrive an escape plan: their companies would divest themselves of all valuable corporate assets, after which Solares and Gardner would renounce their U.S. citizenships, move all corporate assets offshore, and then reclaim ownership of the assets. *See* Docket # 55 at 2-3.[4] To accomplish this, the relevant corporate assets were first purchased by three new companies, namely DNC Holdings, Inc. ("DNC"), Domain Apps, LLC ("DA"), and DOM Holdings, Inc. ("DOM") (together the "Three Companies"). The Three Companies, in turn, would be owned and operated by Gardner and Solares' preferred executives, Decossas and Faia, until Solares and Gardner could repurchase the entities (which Decossas and Faia had paid for) and move them offshore.

Of course, Solares and Gardner did not want to give up their corporate assets without a mechanism in place to ensure that they could "unwind" the deal immediately and reclaim all assets. They accordingly requested that they be provided written "option" agreements (the "Options"), that would, at their first sign of trouble, allow Solares and Gardner to buy and seize all stock or equity interests in the Three Companies. *See* Docket # 55 at 3. At least at first, Solares and Gardner did not want the options to be held in their own names, as that would potentially allow Solares and

---

[3] *See Dell Inc. v. Sigmund Solares et al.*, No. 07-2668 (E.D. La.) (Zainey, J.) (Complaint filed 4.26.2007), Docket # 1-3 ("Dell brings this action against Defendants for trademark infringement . . . cybersquatting under the Anticybersquatting Consumer Protection Act, . . . and violation off the Racketeer and Corrupt Organizations Act."); *Verizon Trademark Services LLC v. Sigmund Solares, Michael Gardner, et al.*, No. 10-cv-00665 (M.D. Fla., Tampa Div.) (Complaint filed 3.19.2010), Docket # 1 ("Plaintiffs are informed and believe, and on that basis allege, that the Individual Defendants have used shell-companies or false identities to conceal their true identities and their involvement in the registration of, use of, or trafficking in domain names that are identical or confusingly similar to the distinctive trademarks of others"); *Verizon California, Inc. v. Directnic LTD et al.*, No. 12-cv-759 (C.D. Cal.) (Complaint filed 1.27.2012), Docket # 1 ("Defendants are serial cybersquatters who register, use, and traffic in domain names that are confusingly similar to famous trademarks owned by others.").

[4] *See also* Exhibit 1 at ¶ 9 (Solares 2017 complaint) ("Thereafter, the Companies would be operated from outside of the United States where they were less likely to be the target of costly litigation and regulation.").

Gardner's creditors to contest the transaction or seize the Options. Conveniently, surreptitious recordings made by Solares document the development of his and Gardner's final solution: Solares would name his trusted sister as his "nominee" to hold the Options on his behalf, whereas Gardner would similarly name his mother to serve as his "nominee."

What happened next is highly disputed. Option agreements relating to the Three Companies were drafted in 2011 and 2012, but only one portion of the drafted Gardner Options (the DNC/DOM option) referred to Gardner's mother, whereas the remaining Option draft named Gardner himself as the recipient. Similarly, some of the drafted Solares Option documents refer to his sister, but another portion of his proposed Options is confusingly held by "Sigmund J. Solares or Vivian Solares." In any case, though, despite seven years of litigation, no one has been able to locate or produce a signed version of any Option document, nor is there any record of any draft Option ever being fully signed. Gardner and Solares discussed innumerable alternatives to shield themselves from liability for their cybersquatting activities and there is great uncertainty as to which means they used to hide from creditors.

### B.    The Solares and Gardner Lawsuits

Following the 2011 and 2012 transactions involving the Three Companies, Decossas and Faia assumed control of the entities, invested their own skill and funds into the entities, and otherwise fulfilled their duties as proper owners. Solares and Gardner occasionally inquired into the operations of the Three Companies, but they were distracted with other ventures, did not particularly like each other, and did not want to spend the money necessary to repurchase the businesses or their assets. Then, around February 2017, Solares learned that the Three Companies had seemingly turned into profitable investments for Decossas and Faia. Claiming to have been

duped, and that Faia and Decossas were obligated to operate the Three Companies "for the benefit of himself and other owners," Solares filed a lawsuit in Orleans Parish. *See* Exhibit 1.

Notably, Solares' lawsuit was based entirely on the assertion that the Three Companies were really *his*, that *he* held the Option rights to acquire the relevant assets, and that the Companies' profits had improperly been stolen from *him*. Never once mentioning his sister, Solares' lawsuit specifically alleged:

> [In 2016], it first became evident to [Solares] that Defendants have for years acted in a concerted effort to intentionally mislead him, defraud him, and steal his ownership interest in, all assets owned by, and all profits generated by the [Three Companies]. What [Solares] believed was a valid and legal process to protect the assets of the Companies for the benefit of himself and other owners, based upon the representations of Faia and Decossas, was in fact a fraudulent scheme devised to deprive him of his ownership interest in the Companies.
> . . . .
> Decossas and Faia breached their fiduciary duties owed to [Solares] when they repeatedly and intentionally misrepresented that [his] ownership in the Companies would be transferred back to him, despite the fact that they had no intention to . . . transfer [his] ownership of the Companies back to [him].
> . . . .
> Up to and including through the date of this filing, Defendants have continued to intentionally misrepresent the revenues and profits of the Defendant Companies and wrongfully convert revenues, profits and assets of the Companies.
> . . . .
> Defendants fraudulently and intentionally delayed [Solares]' discovery that his ownership interests in the Companies . . . had been converted by for years continuously advising [Solares] that he was still a true owner of the Companies . . . and could exercise his ownership rights at any time.
> . . . .
> Decossas and Faia repeatedly and intentionally misrepresented that [Solares'] ownership in the Companies would be transferred back to him (with Solares and Gardner as equal owners).
> . . . .
> [Faia] continuously advis[ed] [Solares] that the asset protection plan was a valid and legal process to protect the assets of the Companies for the benefit of [Solares] and Gardner.

*See, e.g.*, Exhibit 1 at ¶¶ 20, 30, 35-36, 42, 60. Consistent with his claimed Option rights, Solares specifically requested that the Louisiana court declare him to be a one-half owner of the Three

Companies, and that Defendants be ordered to pay him one half of the Three Companies' profits "from 2011 into perpetuity." *Id*. at ¶ 73.

In a later amended pleading, Solares repeated his statements and further reiterated that it was *he* who held the relevant Option right that protected *his* interest in the Three Companies. *See* Exhibit 2 at ¶ 17 ("Solares was told that Faia held documents that protected Solares' true interest in the Companies."); ¶ 39 ("Solares was continually reminded and reassured that he was an owner of the Companies and Defendant Companies and that the pertinent assets were in good hands.").

As the Solares litigation unfolded, in the spring of 2020, Gardner also decided that it was unfair for Faia and Decossas to have earned any money from the businesses he and Solares had together sold. Like Solares, Gardner also posited that Decossas and Faia were not supposed to have received or kept any profits generated by the Three Companies. Also like Solares, Gardner accordingly sued Faia and Decossas, but even more explicitly outlined the basis of his claims:

> With respect to the Companies, Faia's and Decossas's new scheme essentially consisted of the Companies being transferred to them, or entities owned by them, while Gardner and Solares were supposed to be protected by Faia and Decossas and by option agreements which would allow them to purchase their interests back in the future. Faia and Decossas were supposed to continue running the Companies (for which they were well paid) for the benefit of Gardner and Solares while they (Faia and Decossas) determined a way for Gardner and Solares to regain ownership of the Companies without adverse tax or other consequences. . . . Faia and Decossas preyed on and fueled Gardner's fears and repeatedly advised him that executing this revised scheme was in his (and Solares's) best interests to protect their assets.
> . . . .
> Gardner was told that Faia held documents, including option agreements, which protected Gardner's interests in the Companies and assets.
> . . . .
> Afterward, Faia (as Gardner's trusted attorney) took the documents executed by Gardner, including the crucial option agreement, back with him to Louisiana for safekeeping.
> . . . .
> Further, Gardner was told that Faia held documents, including an option agreement, that protected Gardner's interest in the Companies or would assure him interest in the new companies owned by Faia and Decossas.
> . . . .

Following the transfers of assets to Domain Apps and DNC Holdings, Decossas and Faia continued to advise Gardner that he and Solares were equal owners of the revenue, assets, and profits of those companies as well as any other entities to whom the assets . . . had been transferred.

. . . .

Importantly, the option agreements that allowed Gardner and Solares to repurchase the assets from the New Companies had to be exercised jointly. Nevertheless, Faia and Decossas kept Solares and Gardner apart and at odds with each [other] through manipulation, fraud, and deception. . . . Faia and Decossas were telling Solares [negative] things about [Gardner] to make sure that they did not get together and try to exercise their options. Dividing the two owners was now obviously by design.

. . . .

Had Gardner known that the [Three] Companies were raking in millions of dollars of revenue and creating millions of dollars of profits for Faia and Decossas, he would have certainly reached out to Solares to discuss exercising their options and getting their assets back in their names along with their employees. As it stood, though, with Gardner thinking that the New Companies were not profitable, he had no incentive to exercise his options.

Exhibit 3 at ¶ 39, 42, 43, 45, 71, 80, 82.

In April 2020, Solares' state-court lawsuit, which by then also included Gardner's state-court lawsuit (together the "Solares-Gardner Lawsuits"), was removed to the United States Bankruptcy Court in New Orleans.[5] On June 5, 2020, the E.D. La. bankruptcy court transferred the entire case to the U.S. Bankruptcy Court for the Middle District of Florida (Tampa), where Solares, Gardner, Faia, and Decossas were separately embroiled in a related corporate bankruptcy dispute (the "Florida Litigation").[6] At that time, the Solares-Gardner Lawsuits were consolidated with the Florida Litigation and docketed as an associated adversary proceeding.[7]

---

[5] *See Solares v. Faia et al.*, Adv. Proceeding No. 20-01028 (E.D. La. Bkr.) (Removed 4.30.2020).

[6] *See In re TPI*, No. 19-bk-8638-CPM (M.D. Fla. Bkr.) (filed 9.12.2019).

[7] *See In re TPI*, No. 19-bk-8638-CPM (M.D. Fla. Bkr.), Adv. Proceeding No. 20-ap-00352-CPM (transfer effective 4.30.20).

Once in Florida, Gardner did not hesitate to elaborate upon his claims against Faia and Decossas, filing a lengthy affidavit to educate the Florida court. *See* Exhibit 4. Gardner specifically advised the court:

> Only in March of 2020 did I learn that Decossas . . . and Faia . . . stole substantially all of our assets (directnic.com domain registrar, domainapps.com parking and arbitrage through Yahoo! contract) through a long-term con that included, among other things, lying to us about the assets' financial performances, gaslighting, and destroying the protection documents which protected our rights to retake ownership of the assets including stock certificates, stock powers, option agreements, powers of attorney, and executive resignation letters.

Exhibit 4 at ¶ 5. In at least six other affidavit statements, Gardner explained in excruciating detail exactly when and how the Options and other protection documents were executed, in *his* favor, to protect *his* interests in the Three Companies.[8] In numerous other statements, Gardner further described (under oath) how, despite Faia and Decossas' nominal ownership, everyone knew

---

[8] *See* Exhibit 4 at ¶ 30 ("Mr. Faia detailed the protection documents which protected Solares and my interests in TPI successor companies of Domain Apps, LLC, DOM Holdings, Inc., VMS Enterprises, Inc., Vodun, and Parking Newco which would later be name[d] Domain Apps, LLC: . . . Forced Option Agreement (to be completed)."); at ¶ 46 (" I would also bring up exercising the options to get the companies back, which in knew were exercisable for 20 and 30 years, but they said I could not unless Solares exercised his as well. They also said that Solares was crazy and trying to take all the companies from me, so I could not exercise the options."); at ¶ 49 ("I asked: 'Our options have expired? I thought they were 30 years. . . . Neither Daly nor Faia ever answered my question."); ¶ 68 ("On July 12, 2011, Decossas explained how protection documents in favor of Solares and me would be in place for all TPI successor companies including DNC Holdings, Inc., Domain Apps, LLC, DOM Holdings, Inc., and VMS Enterprises, and Parking Newco and would include for each 'stock powers, stock pledges, resignation letters, powers of attorney, and documents stipulating the immediate transfer of stock on demand.'"); ¶ 105 ("On August 25, 2011, Mr. Faia and Mr. Decossas prepared documents that were executed . . . in favor of Solares and me for the following companies: DNC Holdings, Inc., DOM Holdings, Inc., VMS Enterprises, Inc., and Vodun Technologies, Inc. There were the protection documents that included stock powers, stock pledge power of attorney, an option, and resignation letters of the executives so that Solares and I could get ownership of the companies on demand."); ¶ 109 ("On May 16, 2012, when DomainApps, LLC was set up, an option in favor of Solares and me allowed each of us to exercise an option to buy the shares of DomainApps from Mr. Faia and Mr. Decossas.").

Gardner and Solares were the true "owners" entitled to the assets and profits of the Three Companies.[9]

At around the same time, Solares and Gardner—who had until then been adverse—agreed to settle their claims against each other and jointly pursue Faia and Decossas for their rightful ownership of the Three Companies (and all related assets). *See* Exhibit 5. Taking advantage of the tools available in a bankruptcy, Solares and Gardner then joined with the assigned bankruptcy trustee and agreed to continue prosecuting the Solares-Gardner Lawsuits, unwind the 2011 and 2012 transfers of assets to the Three Companies, and "repatriate" the assets into an entity that Solares and Gardner alone controlled.[10]

In short, Solares, Gardner, Faia, and Decossas litigated for years who were the rightful owners of the Three Companies, with little to no reference to Cahill and Sandy. As the Solares-Gardner Lawsuits neared their fifth year, all of the various parties weighed their choices, and, ultimately, agreed to a proposed "global settlement agreement" (the "Settlement"). *See* Exhibit 6. Among other things, Solares and Gardner agreed to drop their claims to the Three Companies, but

---

[9] *See* Exhibit 4 at ¶ 63 ("From January 2011 through 2015, we had hundreds of owner and board meetings with Solares, Faia, Decossas, and me."); ¶ 65 ("Decossas and Faia always represented to Solares and me that the cash at DNC Holdings, Inc., and Domain Apps, LLC were our cash positions."); at ¶ 76 ("Faia and Decossas always stated that profits of DomainApps would be paid to Solares and me. . . . Solares and I set up [two other companies] to receive the profits which were never paid because we were told that the company was barely surviving. I now know that in reality, millions in DomainApps profits were paid to Faia and Decossas."); at ¶ 94 ("Mr. Decossas was the gatekeeper of information to the owners, *i.e*., Solares and me.").

[10] *See* Exhibit 5 at ¶¶ 8, 11 ("The Parties agree their respective equity security holdings in the Debtor were, as of the Petition Date, and remain 50% / 50%. . . . The Parties shall fully cooperate and support all efforts, both individually and through the Trustee, to recover all of the Debtor's business assets and operations, including but not limited to the domain registrar service known as directnic.com, the Yahoo Network Publisher Contract #1 . . . and any other assets or funds which were transferred to or taken by any persons and/or or their direct or indirect affiliated entities including, but not limited to, Gregory Faia, Vernon Decossas, David Vinterella, DNC Holdings, Inc., Domain Apps, LLC, Ads Squared, LLC, Visual Ad Group, Inc., DSE Leasing, LLC, . . . Faia and Associates, LLC, and Dom Holdings, Inc. . . . All such assets (or the value of such assets), operations, and newly created entities shall be brought back into the Debtor.").

Faia and Decossas also reciprocally agreed to transfer to Solares and Gardner various assets, or to assign to Solares and Gardner certain income streams, held by the Three Companies. *See* Exhibit 6 at 12-25. As made clear in the Settlement, one of the stated purposes of the compromise was to settle any and all claims that Solares or Gardner had asserted in the Solares-Gardner Lawsuits,[11] with Solares and Gardner both explicitly agreeing to release both their own claims as well as those of any "affiliated" individual whose businesses Solares and Gardner operated.[12] Elsewhere, Solares and Gardner confirmed that the Settlement would "fully dispose of the [Solares-Gardner Lawsuits] and all associated claims," which claims Solares and Gardner warranted they had "complete authority" to settle. Exhibit 6 at ¶¶ 5, 26. And, in case there was any doubt, Solares and Gardner both confirmed that they had never assigned to anyone any rights or claims that they had asserted in the lawsuits at issue.[13]

In suggesting to the Florida bankruptcy court that it should approve the Settlement and transfer a portion of the Three Companies to them, Solares and Gardner represented that they were not just formal parties, but "*the stakeholders* in this case and its related adversary proceedings." *See* Exhibit 6 at 2. In other Settlement-related filings submitted to the court, Solares and Gardner

---

[11] *See* Exhibit 6 at 3-4 (defining "Solares Adversary Proceeding" as including the original removed "State Court Action" that originated in Louisiana) ('The Solares Adversary Proceeding . . . and all other claims, disputes, and controversies between the Entities on the one hand and the Trustee and the SG Entities on the other are hand are referred to as the 'Settled Claims.'").

[12] *See* Exhibit 6 at 1 ("It is the intention of the Parties to include any and all of their respective subsidiaries and affiliates, whether named explicitly herein or not."); 11 U.S.C. § 101(2)(C) ("The term 'affiliate' means [a] person whose business is operated under a lease or operating agreement by [a party], or person substantially all of whose property is operated under an operating agreement with [a party].").

[13] *See* Exhibit 6 at ¶ 5 ("The Settling Parties each represent that they have not assigned any of their rights, claims, defenses, or causes of action that are related to, the subject of, or in any manner referenced in or impacted by this Agreement (collectively the "Parties Rights") other than assignees explicitly permitted in the Term Sheet and this Agreement. The Settling Parties further represent that they have complete authority to execute and resolve the Parties Rights as they purport to accomplish herein.").

advised the court that the proposed Settlement would not "cause any harm to any third parties" and included "all of the economic interest holders in this Bankruptcy Case and all related adversary proceedings." Florida Litigation, Docket # 561 (Joint Motion to Seal) at 1, 5; *see also* Exhibit 6 at 5 ("The Parties . . . submit that, in their business judgment, the terms [of] the Settlement are overwhelmingly in the best interest of this Estate . . . and other parties in interest."). Expressly relying upon the Parties' representations,[14] the Florida bankruptcy court agreed not to make the terms of the Settlement public, for commercial reasons, and, a few days later, approved the Settlement. *See* Exhibit 7. Notably, however, the Florida court expressly retained jurisdiction to enforce the terms of the Settlement, with the parties asserting that the Florida court would remain the "exclusive venue for any request by any party to interpret and/or enforce the Settlement." *See* Exhibit 6 at 3.

### C.     The Florida Litigation, Phase 2: Cahill and Gardner-as-Executor

In the months following the execution of the Settlement, Faia and Decossas' insurers and business entities transferred substantial monetary funds to Solares and Gardner, including a portion of the assets and operations of the Three Companies. Just as those transfers were completed, Faia and Decossas each received two surprise letters on July 23, 2021—one from Solares' sister (Cahill) and one from Gardner himself (on behalf of his mother). *See* Exhibit 8. According to the revelatory letters, the 2011/2012 Options relating to the Three Companies belonged not to Solares and Gardner, but *to Cahill* and *to Gardner's deceased mother*; and, naturally, Cahill and Gardner-as-Executor were purportedly ready to exercise the Options (which had for ten years been claimed by

---

[14] *See* Exhibit 7 (Florida Litigation, Docket # 576) (Order approving Settlement) ("[A]ll parties in interest support [the Settlement']s approval and are aware of its terms.").

Solares and Gardner) and take ownership of the Three Companies (which had just been duped out of various assets by Solares and Gardner in the Settlement). *See id.*

Were it not for the dollars and inconvenience at issue, Cahill and Gardner-as-Executor's ridiculous suggestion might have been comical: Solares (who had assumed control of his sister's legal interests)[15] and Gardner (who now claimed to be acting for his deceased mother) were presenting the same documents again, demanding to be paid again, and requesting the same corporate assets that they had just received through the Settlement (and more). To be clear, the Options that Cahill and Gardner-as-Executor were seeking to enforce were the *very same* Options that Solares and Gardner had: (1) represented were the property of Solares and Gardner in numerous pleadings;  (2) openly admitted were titled in the name of family members only to avoid creditors; (3) confirmed in dozens of sworn statements belonged to Solares and Gardner; (4) affirmed control over in a court-approved settlement agreement; and (5) already exercised and released. Later discovery in the Florida Litigation, as well as testimony in an ensuing trial, hae revealed that this was Solares' and Gardner called "Plan B"—a long-planned scheme to wrest full control of the Three Companies and increase Faia's and Decossas' litigation expenses.

In response to the July 2021 letters, Faia and Decossas quickly reported Solares, Gardner, Cahill's, and Gardner-as-Executor's fraudulent conduct to the Florida bankruptcy court. On August 13, 2021, Faia and Decossas filed a motion to reopen the relevant bankruptcy case, which motion, upon hearing of Solares, Gardner, and Cahill's actions, the Florida court promptly granted. *See* Florida Litigation, Docket ## 667, 680. On September 24, 2021, Faia and Decossas initiated a

---

[15] In fact, to enforce the Options, both Gardner-as-Executor and Vivian Cahill legally appointed Solares (who denied any of this was part of his scheme) as their legal representative, to be their "primary point of contact" with "their" attorneys. Cahill and Gardner-as-Executor further represented that, with respect to the Options, Solares was their "Agent with full and unconditioned decision-making authority." *See* Exhibit 9.

related adversary proceeding against Solares, Gardner, Cahill, and Gardner-as-Executor, seeking a declaration that Cahill and Gardner-as-Executor held no Option rights or other rights in the Three Companies, and/or that any rights they did hold were "as agents and proxies for" Solares and Gardner. *See* Exhibit 10 at 12-14. In related counts, Faia and Decossas further sued Solares, Gardner, Cahill, and Gardner-as-Executor for fraud and for conspiring to intentionally breach the court-approved Settlement. Exhibit 10 at 14-17. In a subsequent amended pleading, Faia and Decossas have alleged in great detail how Cahill and Gardner-as-Executor are liable in various ways for their participation in Solares and Gardner's fraudulent Option-enforcement scheme. *See* Exhibit 11.

Faced with Faia and Decossas' suit, Cahill and Gardner-as-Executor tried but failed to persuade the Florida court that it lacked subject matter jurisdiction over the claims. *See* Florida Litigation, 21-ap-333, Docket # 75. Forced to answer and assert their defenses, Cahill and Gardner-as-Executor eventually responded to Faia and Decossas' September 2021 adversary complaint. *See* Exhibit 12. Cahill and Gardner-as-Executor principally asked that the Florida court dismiss Faia and Decossas' claims and reject the notion that Cahill and Gardner-as-Executor have no Option rights. *See id*. However, in asserting their "fraud" defense, Cahill and Gardner-as-Executor also asked the Florida court to deny Faia and Decossas any relief because they have purportedly (1) prevented Cahill and Gardner-as-Executor from exercising their Options with respect to the Three Companies; (2) misrepresented the financial status of the Three Companies by fraud and concealment; and (3) wrongly obtained, used, and controlled the assets of the Three Companies for the exclusive financial benefit of Faia and Decossas. *See* Exhibit 12 at 43-44.

### D.      The Eastern District of Louisiana Litigation

Following the commencement of the Florida adversary proceeding against Cahill and Gardner-as-Executor, they did everything they could to escape, including insisting that any dispute relating to the Options had to be brought in Louisiana. *See* Florida Litigation, 21-ap-333, Docket # 14 at 9. In a hearing on January 21, 2022, counsel for Cahill and Gardner-as-Executor complained to the Florida court that, in the event that Cahill and Gardner-as-Executor were found not to be nominees, they wanted to have "this on file in Louisiana." *See* Florida Litigation, 21-ap-333, Docket # 76 at 48. Warning Cahill and Gardner-as-Executor of the possible issues caused by overlapping litigation, the Florida court nonetheless agreed it need not prohibit Cahill and Gardner-as-Executor from preserving their supposed claims and jurisdictional objections by filing a lawsuit in Louisiana.[16]

A few weeks later, on March 8, 2022, Cahill and Gardner-as-Executor filed their promised "backup" lawsuit, which, of course, is the matter now before this Court. *See* Docket # 1 (Original Complaint). Just as promised, Cahill and Gardner-as-Executor posited that the Options really belonged to them, and that Faia and Decossas were liable for refusing to honor the Options. *See* Docket # 1 at 8 ("Faia . . . drafted several estate planning documents (the Options) that unequivocally established Cahill and Sandra's ownership and control of DNC, DA, and DOM."). And, parroting what they had alleged in Florida, the Louisiana suit charged that Faia and Decossas were additionally liable for pilfering the Three Companies and conveying falsified information

---

[16] *See* Florida Litigation, 21-ap-333, Docket # 76 at 56 (1.21.2022 transcript) ("**Court:** With regard to Louisiana, I think somebody needs to alert the judge that I think the Ladies are indispensable parties, because they're going to argue that they have rights, and the other side's going to argue that, no, their realties said that they don't. And therefore as a matter of proof, they don't. And they need to be able to say how independently they believe that that's not so and that their relatives are, in effect, lying when they said those things before. **Counsel:** Understood, Your Honor. I will relate to the Louisiana counsel that they need to make sure that that court is aware of what's happening here. **Court:** Because they're here first, and I haven't cut them loose yet.").

related to the Three Companies. *See id.* at ¶ 103 ("Since 2014, millions of dollars in assets have been converted that properly belong to DNC and DA, and Cahill and Sandra as the owners of these entities.").

Since March 2022, Cahill and Gardner-as-Executor have amended their complaint several times. *See* Docket # 17, # 55. In its final iteration, however, the hundreds of allegations it contains—and the $100 million in claimed damages—all rest entirely on one premise: that Cahill and Sandy were not simply "nominees" with respect to the Options, but the real parties-in-interest who hold (or were convinced they held) full control of the Options for their own benefit.[17] Or, as Cahill and Gardner-as-Executor's complaint sums up the matter: "The crux of this litigation are these Options." Docket # 55 at 3. Of course, the same is true of the Florida Litigation, where all of the Parties in *this* matter have spent the last twenty-five months seeking to have the validity of

---

[17] *See, e.g.*, Docket # 55 at ¶ 198 ("Vivian and Sandra, as the owners of DA by virtue of their exercise of the Options, have also been injured . . . "); ¶ 12 ("Plaintiffs Vivian and the Estate, individually, and as owners of the equity interests in the Three Companies by virtue of the exercise of the Options, also assert causes of action . . . involving breach of fiduciary duty, breach of contract, and conversion."); p. 3 ("The crux of this litigation are these Options: the Options in DOM, DNC, and DA were executed for the benefit of Vivian and Sandra."); ¶ 106 ("[Ad Squared] continues to generate substantial revenue and profits that rightfully belong to DA and its owners, Vivian and Sandra, by virtue of their exercise of the Options."); ¶ 356 ("Through their ownership of DA, Vivian and Sandra have a direct and protectable property interest in the Yahoo! contract."); ¶ 396 ("As the owners of DA, Vivian and Sandra possess a direct and protectable property interest in DA's assets."); ¶ 414 ("As the owners of DA, Plaintiffs Vivian and Sandra have been deprived of a legitimate business opportunity to operate their company."); ¶ 434 ("In the Options, Faia and Decossas covenanted and warranted not to transfer, assign, or diminish in value the assets of DA."); ¶ 515 ("Plaintiffs Vivian and Sandra should own DA. They cannot operate their company due to the loss of DA's assets."); ¶ 530 ("Faia and Decossas fraudulently induced Vivian and Sandra not to exercise their Options in DNC, DOM, and DA."); ¶ 531 ("Faia and Decossas breached their fiduciary duties owing to DNC and DA and therefore Plaintiffs when they fraudulently converted assets belong to these companies."); ¶ 542 ("As further detailed with specificity *ad nauseum*, Faia and Decossas have engaged in a pattern of fraudulent acts, all of which were intended to deprive the Plaintiffs of their assets and ownership interests in DNC, DOM, and DA."); ¶ 559 ("Faia and Decossas defrauded Vivian and Sandra into thinking that their ownership interests in DA was secure and protected."); ¶ 565 ("By virtue of the duly executed Options for DNC, DOM, and DA, vesting ownership of these companies with the Plaintiffs, . . . the Plaintiffs assert that Faia and Decossas should be compelled to specifically perform their obligations as set forth in those agreements."); ¶ 578 ("Faia and Decossas have perpetrated a fraud on the Plaintiffs, and they continue to perpetuate a fraud on the Plaintiffs by denying Plaintiffs access to the Options.").

"the Options" adjudicated. *See* Exhibit 10, Exhibit 11, Exhibit 12. Just as the "crux" of this litigation is the Options, the central issue in the Florida case is whether there were valid, executed options, and whether Cahill and Sandy were merely the alter-egos/proxies, or nominees of Solares and Gardner. Indeed, the Parties are presently awaiting a ruling on that very issue from the Bankruptcy Court.

Presumably, Cahill and Gardner-as-Executor do not dispute that the Florida Litigation and this matter concern the same claims, the same parties, and the same issues. Every party before this Court is already joined in the Florida Litigation and has already taken the same positions taken in this Court. Indeed, large swaths of Cahill and Gardner-as-Executor's complaint in this matter have been copied directly from their Florida pleadings. *Compare* Docket # 55 at 1-3 to Exhibit 12 at 39-42. Given the obvious overlap between the Florida Litigation and this matter, all Parties even agreed to stay this matter (twice) and to submit a "dispositive threshold question" to the Florida court. In particular, the Parties jointly advised this Court as follows:

> The instant matter is not the first litigation involving the same individuals. . . . In order to streamline the multi-front legal proceedings, Plaintiffs and Defendants have agreed to submit a dispositive threshold question for resolution by the U.S. Bankruptcy Court: whether Plaintiffs in this matter, with respect to the alleged Option documents, were and are merely the "nominees" of Sigmund Solares and Michael Gardner.
> . . . .
> To be clear, by virtue of [an agreed] order, the U.S. Bankruptcy Court is scheduled to conduct a trial . . . to determine whether the Plaintiffs in this matter have any relevant rights not already released in the Settlement. Exhibit A. The resolution of this threshold issue will directly impact whether and to what extent Plaintiffs can proceed with the claims asserted in the Amended Complaint [in this matter].

Docket # 20 at ¶¶ 3, 11, 12 (8.4.2022 Joint Motion); *see also* Docket # 22 at ¶¶ 2 (11.18.22 Joint Motion) ("A related matter is currently being litigated between the Plaintiffs and Defendants in the U.S. Bankruptcy Court for the Middle District of Florida.").

In accordance with the Parties' agreement, several months ago, the Florida court concluded a five-day trial in which all Parties to this litigation actively participated. Specifically, from November 7 to November 9, 2022, and then on January 17 and 18, 2023, the Florida court received evidence and testimony relating to the existence and enforceability of the Option agreements that are the basis of all claims before this Court. *See* Florida Litigation, Docket # 354, # 361, # 362, # 406, # 408, # 412. On March 6, 2023, the Parties each submitted proposed findings of fact and conclusions of law to the U.S. Bankruptcy Court judge. *See* Florida Litigation, Docket # 438, # 439. The Bankruptcy Judge has stated that she will render her ruling by the end of this month, October 2023.

## II.    LAW AND ANALYSIS

### A.    This Action Should be Dismissed, or Alternatively, Transferred to the Middle District of Florida.

#### 1.    The First-to-File Rule.

The first-to-file rule is a judicially-created procedural mechanism for transferring venue. *Cormeum Lab Servs. v. Coastal Labs*, No. 20-2196, 2021 U.S. Dist. LEXIS 227394 at *7 (E.D. La. Jan. 15, 2021). The rule is based on principles of comity and sound judicial administration. *Cadle Co. v. Whataburger of Alice*, 174 F.3d 599, 603 (5th Cir. 1999) (citing *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997)). The purpose of the rule is to "avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Cadle Co.*, 174 F.3d at 603 (citing *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 (5th Cir. 1985)). It "minimize(s) embarrassing inconsistencies by prophylactically refusing to hear a case raising issues that might substantially duplicate those raised by a case pending in another court." 174 F.3d at 604.

The first-to-file rule is a discretionary doctrine. *LA. Asset Mgmt. Pool v. Bank of Am. Corp.*, 20-1095, 2020 U.S. Dist. LEXIS 245111 at *6 (E.D. La. Dec. 31, 2020) (Guidry, J.). Under the rule, when related cases are pending before two federal courts, the second-filed court may refuse to hear it if the issues raised by the two cases substantially overlap. *Cadle Co.*, 174 F.3d at 603. Two cases do not have to be identical to substantially overlap. *LA. Asset Mgmt.*, 2020 U.S. Dist. LEXIS 245111 at *6. In determining whether the two cases substantially overlap, courts consider "whether core issues are the same or whether much of the proof adduced would likely be identical." *Cormeum Lab Servs.*, 2021 U.S. Dist. LEXIS 227394 at *7. When the overlap between two cases is less than complete, courts determine the applicability of the first-to-file doctrine by assessing the following factors: "the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute." *Id.* (citing *Save Power*, 121 F.3d at 948). Unless there are compelling circumstances, the first filed court should be the court to decide whether it will try the case. *N. Collin Special Util. Dist. v. City of Princeton*, 42-2, 2023 U.S. Dist. LEXIS 169874 at *8 (E.D. Tx. Aug. 14, 2023) (quoting *Gateway Mortg. Grp., L.L.C. v. Lehman Bros. Holdings*, Inc., 694 F. App'x 225, 227 (5th Cir. 2017)).

The first-to-file rule determines which court may decide the merits of substantially overlapping cases. *LA. Asset Mgmt.*, 2020 U.S. Dist. LEXIS 245111 at *6. Additionally, it establishes which court may decide whether the second suit filed should be dismissed, stayed, transferred, or consolidated. *Cadle Co.*, 174 F.3d at 606. Fifth Circuit precedent establishes that once a court determines that the issues before it might substantially overlap with issues already brought before a different court, the proper course of action is for the second filed court to transfer the case to the first filed court. *Id.* (citing *Save Power*, 121 F.3d at 948) ("[T]he Fifth Circuit adheres

to the general rule, that the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed.")).

Courts in the Fifth Circuit have identified three exceptions to the first-to-file rule. *Cormeum Lab Servs.*, 2021 U.S. Dist. LEXIS 227394 at **7-8 (E.D. La. Jan. 15, 2021) (citing cases). When one of these exceptions is triggered, the first-to-file rule is disregarded even if the cases substantially overlap. *Id.* The first exception occurs when "a party engage[s] in bad faith conduct, by inducing an opposing party to delay filing of a lawsuit, so that he [may] file a preemptive lawsuit." *Id.* (quoting *In re Toyota Hybrid Brake Litig.*, 20-127 at 13, 2020 U.S. Dist. LEXIS 194964 (quoting *Chapa v. Mitchell*, 2005 U.S. Dist. LEXIS 42441 (W.D. Tex. Nov. 4, 2005))). The second exception occurs when "a party files a declaratory judgment action in anticipation of a suit by its adversary, which can create an opportunity for forum-shopping." *Id.* (quoting *True View Surgery Ctr. One, L.P. v. Goodman Glob. Holdings, Inc.*, 05-769, 2016 U.S. Dist. LEXIS 22593 (S.D. Tex. Feb. 24, 2016)). The third exception occurs when "[a forum selection] clause is found to be valid and enforceable because to do otherwise "would encourage parties to rush to the courthouse to file lawsuits for the purpose of circumventing their agreed-upon promises. *Id.* (quoting *Dixie Electric, LLC v. Jarwin*, 2017 U.S. Dist. LEXIS 232663, 2017 WL 8727481 at *7 (W.D. Tex. June 20, 2017)).

### 2. *Plaintiffs' claims should be dismissed, or alternatively, transferred to the Middle District of Florida.*

Here, the parties' rights and obligations are already being litigated in the Middle District of Florida. This Court should dismiss this litigation in favor of that court. Alternatively, this Court should transfer this case to the Middle District of Florida based on the first-to-file rule.

*Cadle Co. v. Whataburger of Alice*, 174 F.3d 599, 603 (5th Cir. 1999) strongly supports such a holding. In *Cadle Co.*, the founder of a family-owned corporation filed for Chapter 7 bankruptcy

in the United States Bankruptcy Court for the Southern District of Texas ("Bankruptcy suit"). *Id.* at 601. Three years later, a related case was filed in the United States District Court for the Western District of Texas ("District Court suit"). *Id.* The District Court relied on the first-to-file rule and ruled that the issues pending in the Bankruptcy suit substantially overlapped with the issues raised in the District Court despite the fact that the two suits did not have identical parties. *Id.* at 602 ("The fact that the attorney and accountant are named as defendants in the district court suit but not in the bankruptcy complaint does not, in the district court's opinion, render the cases so dissimilar as to warrant action at the district court level"). The same reasoning applies here, but with even greater force. All Parties in this matter have acknowledged to the Court that the resolution of a threshold issue before the Bankruptcy Court will "directly impact whether and to what extent Plaintiffs can proceed with the claims asserted in the Amended Complaint" in the Eastern District of Louisiana. *See* Joint Motion to Stay Proceedings (Rec. Doc. 20) at 5. Based on these representations, the Court stayed the proceedings. *See* Order Granting Joint Motion to Stay Proceedings (Rec. Doc. 21).

*Cormeum Lab Servs. v. Coastal Labs*, No. 20-2196, 2021 U.S. Dist. LEXIS 227394 (E.D. La. Jan. 15, 2021) further supports the conclusion that this action should be transferred to the Middle District of Florida. In *Cormeum*, the court ruled that when the issues in two actions are not identical or nearly complete, courts should assess the applicability of the first-to-file rule under the following factors: 1) the extent of overlap; 2) the likelihood of conflict; and 3) the comparative advantage and the interest of each forum in resolving the dispute. *Id.* at 20 (citing *Save Power Ltd. v. Syntek Finance Corp.*, 121 F.3d 947, 950-51 (5th Cir. 1997)). First, the court determined that the extent of overlap was substantial. It reasoned that the issues in each action are likely to be mostly the same and that the witnesses to be called in the second filed action were likely to be called in the first filed action. *Id.* at 21. Second, the court determined that the likelihood of inconsistent rulings was

21

"obvious." *Id.* at 22 (citing *Int'l Fidelity Ins. Co. v. Sweet Little Mex. Corp.*, 665 F.3d 671, 678 (5th Cir. 2011)). Lastly, it determined that comity and judicial economy were best served by transferring the second filed suit to the first filed-court since the first-filed court had a superior interest in resolving the issues. *Id.* at 22.

The same reasoning applies here. The issues pending before the bankruptcy court in Florida Litigation substantially overlap with the issues raised in this suit. The central issue in the Florida Litigation is whether there were valid, executed options, and whether Cahill and Sandy were merely the alter-egos/proxies, or nominees of Solares and Gardner. *See* Exhibits 10-12. Similarly, the central issue in the Louisiana Action will be whether Cahill and Sandy are simply "nominees" with respect to the Options, or whether they are the real parties-in-interest who hold full control of the Options for their own benefit.[18]

In addition, the witnesses likely to be called in the Louisiana action are the same as those already called and participating in the Florida Action, particularly Solares, Gardner, Decossas, Faia, and many others. The degree of overlap of issues and parties between the Florida Action and the Louisiana Action is substantial. Because of this, the likelihood of inconsistent rulings is strong. Moreover, the Florida Court has a superior interest in resolving the issues because it has already dedicated years to addressing the underlying issues, and it is the Florida Court that was lied to and whose Settlement-approval judgment was intentionally violated.

Finally, none of the three exceptions to the first-to-file-rule apply. Defendants did not engage in bad faith conduct or anticipatory filing, and there is no valid or exclusive forum selection clause.

Since the issues in this suit substantially overlap with issues already brought before the Florida court, the proper course of action is for the Eastern District of Louisiana to dismiss this

---

[18] *See* Docket # 55 at ¶ 198.

matter or transfer the case to the Bankruptcy Court. *See Cadle Co.*, 174 F.3d at 606 (citing *Save Power Ltd.*, 121 F.3d at 948) ("[T]he Fifth Circuit adheres to the general rule, that the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed").

For these reasons, this Court, in its discretion, should dismiss this suit or, alternatively, transfer this case to the Middle District of Florida.

**B.  Alternatively, Plaintiffs' Action Should be Dismissed for Failure to Join Solares and Gardner as "Required" Parties.**

*1.  The Rule 12(b)(7) Standard.*

Rule 12(b)(7) allows a suit to be dismissed when the plaintiff fails to join a required party under Rule 19. Fed. R. Civ. P. 12(b)(7). Pragmatic concerns, such as the effect of non-joinder on the parties and on the litigation, direct a court's decision on joinder. *Developers Sur. & Indem. Co. v. Harding Vill., Ltd.*, 06-21267, 2007 U.S. Dist. LEXIS 9437 (S.D. Fla. Feb. 9, 2007) (citing *Smith v. State Farm Fire & Cas. Co.*, 633 F.2d 401, 405 (5th Cir. 1980)).

Rule 12(b)(7) requires a two-step inquiry. First, the court must determine whether the absent party is required to be joined under Rule 19(a). *See* Fed. R. Civ. P. 19(a); *August v. Boyd Gaming Corp.*, 135 Fed. Appx. 731, 732 (5th Cir. June 22, 2005); *Sullivan v. Feldman*, 20-2236, 2022 U.S. Dist. LEXIS 228367 (S.D. Tex. Dec. 19, 2022). To determine this, courts consider: 1) whether complete relief can be granted without joining the absent party; 2) whether the absent person or entity claims an interest relating to the action and is so situated that, if the action is resolved in their absence, their ability to protect their own interest will be impaired or impeded; or 3) existing parties might be subject to a substantial risk of multiple or inconsistent obligations. Fed. R. Civ. P. 19(a)(1); *Sullivan*, 2022 U.S. Dist. LEXIS 228367 at *27. If the court determines that the absent party is a

required party under Rule 19(a), the court must join the party if feasible. *See August*, 135 Fed. Appx. at 732; *Sullivan*, 2022 U.S. Dist. LEXIS 228367 at *27.

Second, if a court determines that an absent party is required under Rule 19(a), but joinder is not feasible, then the court must determine whether, "in equity and good conscience," the action should proceed among the existing parties or the action should be dismissed. Fed. R. Civ. P. 19(b). In other words, the court must determine whether the absent party is "indispensable" to the action under Rule 19(b). *See* Fed. R. Civ. P. 19(b); *Sullivan*, 2022 U.S. Dist. LEXIS 228367 at *28-29. To determine this, courts consider several factors: 1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; 2) the extent to which any prejudice could be lessened or avoided by protective provisions in the judgment, shaping the relief, or other measures; 3) whether a judgment rendered in the person's absence would be adequate; and 4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder. Fed. R. Civ. P. 19(b); Fed. R. Civ. P. 19(b).

The Fifth Circuit has ruled that "where an initial appraisal of the facts reveals the possibility that an unjoined party is arguably indispensable, the burden devolves upon the party whose interests are adverse to the unjoined party to negate the unjoined party's indispensability to the satisfaction of the court." *Ranger Ins. Co. v. United Housing of New Mexico, Inc.*, 488 F.2d 682 (5th Cir. 1974) (citing *Boles v. Greenville Housing Authority*, 6 Cir., 1972, 468 F.2d 476, 478 (6th Cir. 1972)).

### 2. *Plaintiffs' claims must be dismissed under Rule 12(b)(7).*

Joinder of Solares and Gardner to this suit would not deprive the district court of federal jurisdiction because the claims arise under federal law. Accordingly, the relevant inquiry is the second step of the Rule 12(b)(7) analysis—whether Solares and Gardner should be added under the requirements of Rule 19(a).

In the Florida Action, Faia and Decossas have alleged and have tried the core issues raised in the Louisiana Action, *i.e.* that Solares and Gardner are the real parties in interest, that Cahill and Sandy are mere nominees, and that the entire matter was settled by virtue of the global Settlement.

Solares and Gardner are indispensable parties to this suit under Rule 19(a) because they have an interest relating to the subject of the action. Disposing of the action in Solares' and Gardner's absence would leave Faia and Decossas subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations. Fed. R. Civ. P. 19(a)(1)(B)(ii).  Indeed, Cahill is literally seeking some of the very same corporate assets that Solares (Cahill's appointed agent with respect to "her" Options) is simultaneously demanding to be turned over pursuant to the Settlement and as a result of his past purported exercise of the same Options. Joinder of Solares and Garnder is plainly feasible. Gardner-as-Executor is already a plaintiff, on behalf of Sandy's estate, and there is no impediment to joining Solares, who demonstrably spearheaded the initiation of this suit.

Accordingly, this Court, in its discretion, should dismiss this case due to failure to join indispensable parties.

### C.   In the Alternative, Plaintiffs' LUTPA and Delictual Fraud Claims Should be Dismissed as Facially Prescribed.

Plaintiffs' Second Amended Complaint alleges nine counts and one "alternative theory" against Defendants.  In addition to Defendants' requests for dismissal or transfer under the first-to-file rule and dismissal under Rule 12(b)(7), the Court should dismiss two of Defendants' counts as time-barred; specifically, Count 4 (LUTPA) and Count 3 (Fraud).  *See* Docket # 55 at ¶¶ 539-555 (Fraud) and 556-562 (LUTPA).

Most, if not all, of Plaintiffs' LUTPA and fraud allegations against Defendants center upon incidents that occurred in 2020, or earlier.  Indeed, Plaintiffs allege that "the events giving rise to this action occurred while Sandra was still living," Docket # 55 at 7, n.5, and that Sandra died on

August 2, 2020. *Id.* at ¶ 1(b).  Plaintiffs also allege that "[t]he fraud, deception, theft, and intentional misrepresentations of fact engaged in by Faia and Decossas regarding the financials of the Three Companies spanned from 2011 through at least August 2016." *Id.* at ¶ 86.  Such alleged actions, on the face of the amended complaint, occurred more than one-year before they filed the Louisiana Action in March 2022.

Plaintiffs allege repeatedly that in 2019, 2020, and "2019-2020" they "discovered" the alleged actions and that the alleged actions were "revealed," via discovery produced in 2019-2020 in the Florida Litigation. *E.g., Id.* at ¶¶ 25, 62, 71, 72, 117, 102, 103, 154, 163.  For example, in paragraph 23, Plaintiffs allege, Vivian and Sandra "were advised in 2019-2020 that Faia and Decossas disavowed the existence of any executed protection documents, including the Options." *Id.* at ¶ 23. In paragraph 163, they allege "Neither Vivian, nor Sandra authorized any such service agreements. Furthermore, neither Vivian nor Sandra had any knowledge regarding these service agreements until 2019-20 when this information was first discovered." *Id.* at ¶ 163. And they claim that "[i]n March 2020, Gardner learned that Faia and Decossas had deceived and defrauded him, as well as Solares, Vivian and Sandra." *Id.* at ¶ 84.

In short, insofar as Plaintiffs purport to advance theories of recovery against Defendants under LUTPA and fraud that are subject to a one-year statute of limitation or prescriptive period, it is manifest that those claims are time-barred because the alleged actions and Plaintiffs' alleged discovery occurred more than one year before this suit was filed, or March 8, 2021.

i.  <u>LUTPA.</u>

LUTPA provides that actions brought under it "shall be subject to a liberative prescription of <u>one year</u> running from the time of the <u>transaction or act</u> which gave rise to this right of action." La. Rev. Stat. § 51:1409 (as amended in 2018) (emphasis added).

Although prescription is an affirmative defense, a Rule 12(b)(6) motion to dismiss may be granted on the basis of prescription if the untimeliness appears from the face of the complaint. *Potier v. JBS Liberty Sec., Inc.,* No. 6:13-CV-00789, 2014 WL 5449726, *3 (W.D. La. Oct. 24, 2014). Therefore, "[a] Rule 12(b)(6) motion to dismiss for failure to state a claim is an appropriate method for raising a statute of limitations defense." *Mann v. Adams Realty Co.,* 556 F.2d 288, 293 (5th Cir. 1977). Here, Defendants urge the Court to find that Plaintiff's LUTPA claim is prescribed. Generally, the party urging prescription bears the burden of proof on the issue. *Taranto v. La. Citizens Prop. Ins. Corp.,* 2010-0105 (La. 3/15/11); 62 So. 3d 721, 726. "However, if the petition is prescribed on its face, then the burden of proof shifts to the Plaintiff to negate the presumption by establishing a suspension or interruption." *Id.*

In their LUTPA claim, Plaintiffs allege, "Faia and Decossas' fraudulent and deceptive conduct, as specifically outlined *ad nauseum*…constitute deceptive acts or practices in the conduct of a business, trade, or commerce, in violation of LUTPA." Docket # 55 at ¶ 558.

Based on the allegations cited and quoted above, there is no doubt that the LUTPA violations alleged by Plaintiffs are alleged to have occurred more than one year before Plaintiffs filed suit on March 8, 2022. *See id.* at, *e.g.,* p. 7 n.5 and ¶¶ 1(b), 25, 62, 71, 72, 86, 117, 102, 103, 154, 163. Plaintiffs allege that (1) Defendants' actions well before March 8, 2021, violated LUTPA, and (2) Plaintiffs learned of the alleged underlying actions before March 8, 2021. The Court should accordingly dismiss Plaintiffs' LUTPA claim as prescribed.

ii.  <u>Delictual Fraud.</u>

In Louisiana, delictual actions, including claims for fraud, are subject to a liberative prescription period of one year. LA. CIV. CODE art. 3492; *Robin v. Binion*, 469 F.Supp.2d 375, 389 (W.D. La.2007), *aff'd,* 271 Fed. Appx. 436 (5th Cir.2008) *Carville v. Dupont*, 2014-0812, 2015 La.

App. Unpub. LEXIS 125 (La. App. 1st Cir. 3/11/2015); *Simmons v. Templeton*, 723 So.2d 1009, 1012 (La. App. 4th Cir. 1998). Damages ordinarily are sustained from the date injury is inflicted, so long as the injury is apparent to the victim, even though the extent of damages remains indeterminate. *Collinson v. Tarver Land Dev., LLC*, Civ. Action No. 11-1787, 2012 WL 688551, at *1 (W.D. La. Feb. 1, 2012), *R&R adopted*, 2012 WL 692193 (W.D. La. Mar. 2, 2012). Thus, "prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he is the victim of a tort." *Carville,* 2015 La. App. Unpub. LEXIS 125 at *10 (citing *Guillot v. Doughty*, (La. App. 1 Cir. 3/21/14), 142 So.3d 1034, 1046.

In their fraud claim, Plaintiffs allege, "As further detailed with specificity *ad nauseum*, Faia and Decossas have engaged in a pattern of fraudulent acts, all of which were intended to deprive the Plaintiffs of their assets and ownership interests in DNC, DOM, and DA." Docket # 55 at ¶ 542.

As with the LUTPA claim, it is plain on the face of the Second Amended Complaint that the fraudulent acts alleged by Plaintiffs are alleged to have occurred more than one year before Plaintiffs filed suit on March 8, 2022. *See id.* at, *e.g.,* p. 7 n.5 and ¶¶ 1(b), 25, 62, 71, 72, 86, 117, 102, 103, 154, 163. Plaintiffs allege that (1) Defendants' actions well before March 8, 2021, constituted fraud, and (2) Plaintiffs learned of the alleged underlying actions before March 8, 2021. Accordingly, the Court should dismiss Plaintiffs' fraud claim as prescribed.

## III.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this motion and (1) dismiss or, alternatively, transfer this action to the Middle District of Florida pursuant to the first-to-file-rule; (2) dismiss Plaintiffs' action for failing to join Solare as Gardner as required parties under Rule 19; and (3) dismiss Plaintiffs' civil LUTPA and delictual fraud claims as

prescribed and perempted.

Respectfully submitted,

TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P

By:    *Ryan K. French*
    Robert W. Barton, Bar # 22936
      Bob.barton@taylorporter.com
    John S. Campbell, III, Bar # 23674
      Johnstone.campbell@taylorporter.com
    Ryan K. French, Bar # 34555
      ryan.french@taylorporter.com
    450 Laurel Street, 8th Floor (70801)
    P. O. Box 2471
    Baton Rouge, LA 70821-2471
    Phone:  (225) 381-0262

    ***Attorneys for Vernon H. Decossas III, Ads Squared LLC, Visual Ad Group, Inc., and DSE Leasing, LLC***

JONES WALKER L.L.P

    Michael W. Magner, Bar # 1206
      mmagner@joneswalker.com
    Andrew R. Lee, Bar # 21196
      alee@joneswalker.com
    Peter J. Kee, Bar # 34860
      pkee@joneswalker.com
    201 St. Charles Ave. Suite 5100
    New Orleans, LA 70170
    Phone:  (504) 589-8316

    ***Attorneys for Gregory G. Faia, Faia & Associates, LLC, Ads Squared LLC, Visual Ad Group, Inc., and DSE Leasing, LLC***

FRILOT, LLC

    David S. Daly, Bar # 20774
      ddaly@frilot.com
    1100 Poydras St. Suite 3700
    New Orleans, LA 70163
    Phone:  (504) 599-8139

    ***Attorneys for Gregory G. Faia and Faia & Associates, LLC***

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this **18th** day of **October**, 2023, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, and notice of this filing was accordingly sent to all counsel of record through the Court's electronic filing system.

/s/   *Ryan K. French*
Ryan K. French